## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

XHAIL USA, INC. and XHAIL, INC.,

     Plaintiffs,

    vs.

MICHAEL J. KIELY,

     Defendant.

C.A. NO. 22-579-CFC

## DEFENDANT'S FIRST AMENDED ANSWER TO COMPLAINT

Defendant Michael J. Kiely ("Defendant" or "Kiely"), by and through undersigned counsel, hereby answers the Complaint of Plaintiffs Xhail USA, Inc. and Xhail, Inc. (collectively "Plaintiffs" and as a company referred to as "Xhail").

### NATURE OF THE ACTION

1.    Answering Paragraph 1 of the Complaint, Defendant admits the Complaint asserts claims for breach of contract action and seeks damages. Defendant denies each and every remaining allegation contained therein.

### THE PARTIES

2.    Answering Paragraph 2 of the Complaint, Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations and, on that basis, denies those allegations.

-1-

3.     Answering Paragraph 3 of the Complaint, Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations and, on that basis, denies those allegations.

4.     Answering Paragraph 4 of the Complaint, Defendant admits the allegations.

<u>JURISDICTION AND VENUE</u>

5.     Answering Paragraph 5 of the Complaint, Defendant does not contest that the Court has personal jurisdiction in this case.

6.     Answering Paragraph 6 of the Complaint, Defendant does not contest that the Court has subject matter jurisdiction in this case.

7.     Answering Paragraph 7 of the Complaint, Defendant does not contest that venue is proper in this Court in this case.

<u>FACTS</u>

8.     Answering Paragraph 8 of the Complaint, Defendant admits to signing Exhibit A and that the document speaks for itself. Defendant denies each and every remaining allegation contained therein.

9.     Answering Paragraph 9 of the Complaint, Defendant admits to signing Exhibit A and that the document speaks for itself. Defendant denies each and every remaining allegation contained therein.

10.     Answering Paragraph 10 of the Complaint, Defendant admits to signing Exhibit A and that the document speaks for itself. Defendant denies each and every

remaining allegation contained therein.

11.     Answering Paragraph 11 of the Complaint, Defendant admits to signing Exhibit A and that the document speaks for itself. Defendant denies each and every remaining allegation contained therein.

12.     Answering Paragraph 12 of the Complaint, Defendant admits to signing Exhibit A and that the document speaks for itself. Defendant denies each and every remaining allegation contained therein.

13.     Answering Paragraph 13 of the Complaint, Defendant admits that eleven biweekly installments of $3,771.56 were deducted from Defendant's salary earnings. Defendant denies each and every remaining allegation contained therein.

14.     Answering Paragraph 14 of the Complaint, Defendant admits to signing Exhibit A and that the document speaks for itself. Defendant denies each and every remaining allegation contained therein.

15.     Answering Paragraph 15 of the Complaint, Defendant admits to signing Exhibit A and that the document speaks for itself. Defendant denies each and every remaining allegation contained therein.

16.     Answering Paragraph 16 of the Complaint, Defendant admits to receiving a letter from Xhail on November 19, 2021 and that he stopped receiving a salary from Xhail. Defendant denies each and every remaining allegation contained therein.

17.     Answering Paragraph 17 of the Complaint, Defendant admits to signing

Exhibit A and that the document speaks for itself. Defendant denies each and every remaining allegation contained therein.

18.     Answering Paragraph 18 of the Complaint, Defendant admits to signing Exhibit B and that the document speaks for itself. Defendant denies each and every remaining allegation contained therein.

19.     Answering Paragraph 19 of the Complaint, Defendant admits to signing Exhibit B and that the document speaks for itself. Defendant denies each and every remaining allegation contained therein.

20.     Answering Paragraph 20 of the Complaint, Defendant admits to signing Exhibit B and that the document speaks for itself. Defendant denies each and every remaining allegation contained therein.

21.     Answering Paragraph 21 of the Complaint, Defendant admits to signing Exhibit B and that the document speaks for itself. Defendant denies each and every remaining allegation contained therein.

22.     Answering Paragraph 22 of the Complaint, Defendant admits to signing Exhibit B and that the document speaks for itself. Defendant denies each and every remaining allegation contained therein.

23.     Answering Paragraph 23 of the Complaint, Defendant admits to signing Exhibit B and that the document speaks for itself. Defendant denies each and every remaining allegation contained therein.

<u>FIRST CAUSE OF ACTION</u>

24.     Answering Paragraph 24 of the Complaint, Defendant incorporates by reference paragraphs 1-23 of this Answer.

25.     Defendant is unable to respond to Paragraph 25 of the Complaint to the extent it calls for a legal conclusion. Answering Paragraph 25 of the Complaint, Defendant denies the allegations contained therein.

26.     Defendant is unable to respond to Paragraph 26 of the Complaint to the extent it calls for a legal conclusion. Answering Paragraph 26 of the Complaint, Defendant denies the allegations contained therein.

27.     Defendant is unable to respond to Paragraph 27 of the Complaint to the extent it calls for a legal conclusion. Answering Paragraph 27 of the Complaint, Defendant denies the allegations contained therein.

28.     Defendant is unable to respond to Paragraph 28 of the Complaint to the extent it calls for a legal conclusion. Answering Paragraph 28 of the Complaint, Defendant denies the allegations contained therein.

<u>SECOND CAUSE OF ACTION</u>

29.     Answering Paragraph 29 of the Complaint, Defendants incorporate by reference paragraphs 1-23 of this Answer.

30.     Defendant is unable to respond to Paragraph 30 of the Complaint to the extent it calls for a legal conclusion. Answering Paragraph 30 of the Complaint, Defendant denies the allegations contained therein.

31.     Defendant is unable to respond to Paragraph 31 of the Complaint to the extent it calls for a legal conclusion. Answering Paragraph 31 of the Complaint, Defendant denies the allegations contained therein.

32.     Defendant is unable to respond to Paragraph 32 of the Complaint to the extent it calls for a legal conclusion. Answering Paragraph 32 of the Complaint, Defendant denies the allegations contained therein.

33.     Defendant is unable to respond to Paragraph 33 of the Complaint to the extent it calls for a legal conclusion. Answering Paragraph 33 of the Complaint, Defendant denies the allegations contained therein.

34.     Defendant is unable to respond to Paragraph 34 of the Complaint to the extent it calls for a legal conclusion. Answering Paragraph 34 of the Complaint, Defendant denies the allegations contained therein.

## **DEFENDANT'S AFFIRMATIVE DEFENSES**

35.     Defendant asserts the following affirmative defenses and provides the following general factual support for Defendant's defenses.

36.     Defendant's contract for employment included a housing allowance, in addition to salary, for Defendant living in the United States.  Prior to June 2021, Defendant's housing allowance was paid for a relatively small apartment for Defendant's family and Defendant.  Prior to June 2021, the Xhail/HYPH entities were responsible for the lease and payment of the rent for Defendant's housing. Prior to June 2021, Defendant's housing allowance was also reflected on

Defendant's paystubs.

37.     In May 2021, Defendant and Max Renard ("Renard") discussed Renard formally becoming the Chief Executive Officer (CEO) of the Xhail/HYPH entities. Renard demanded that Defendant, in his role as a Chairman of the Board, approve an increase in Renard's compensation.   Defendant agreed.   As part of those discussions, Renard offered an increase in Defendant's housing allowance so that Defendant and Defendant's family could move into bigger housing, and Renard stated that Renard would get it approved by the requisite the Xhail/HYPH entities.

38.     Renard then negotiated the lease of a house for Defendant (2093 Mt. Olympus Dr., Los Angeles, CA 90046), and the lease was initially drafted with Xhail USA, Inc. as the tenant.   As with Defendant's prior housing, the Xhail/HYPH entities were going to directly pay for the lease on the house.   Renard then changed his mind.   He told Defendant that the lease would be changed to be in Defendant's name because of concerns regarding potential liability for the company should something happen at the property with Xhail USA, Inc. as the "tenant" on the lease. In connection with changing the lease, Renard told Defendant that how the housing was paid for would have to be restructured.   Instead of the Xhail/HYPH entities paying for the housing directly, Renard told Defendant that the Xhail/HYPH entities would "loan" Defendant the money for the housing and that Defendant's salary would be changed to correspond with the "loan" for the lease.   Executives at the Xhail/HYPH entities repeatedly told Defendant that nothing would change from

Defendant's prior housing arrangement, only how it was accounted for. For example, Steve Gallucci (Chief Financial Officer at the Xhail/HYPH entities at the time) stated in an email on June 28, 2021 that, pursuant to the "loan" agreement, there would be changes in Defendant's paycheck in the categories that make up gross wages and deductions, but "[t]he net amount will not change significantly." That is ultimately what happened. After Defendant moved to the new housing, Defendant's net paycheck amount did not change significantly.

39.     Additionally, the Xhail/HYPH entities agreed to advance Defendant $60,000 to furnish the new housing. It was agreed that this would be repaid in one lump sum once Defendant had sold certain shares after the company's next funding round that was to close in the summer of 2021. However, that round ran late and did not close until after Defendant was ousted (in November 2021).

40.     As part of the arrangement, Defendant signed the First Loan Agreement and Second Loan Agreement. Defendant was repeatedly told by executives at the Xhail/HYPH entities, before and after signing the First Loan Agreement and Second Loan Agreement, that the purported loans would never be enforced in the traditional sense.

41.     For the purported First Loan Agreement, as discussed above, Plaintiffs represented that the purported "loan" was actually an accounting mechanism for the company to pay for Defendant's housing in Los Angeles while he worked at the Los Angeles office.

42.    Additionally, when the housing arrangement was made, and the agreement signed for the purported loan, Defendant did not know that individuals at the Xhail/HYPH entities intended to oust Defendant from the company.  Had Defendant known that the Xhail/HYPH entities intended to oust Defendant from the company, Defendant would not have signed the document.  It would have made no sense for Defendant to commit to a 12-month lease in Los Angeles unless Defendant was working for the Xhail/HYPH entities in the Los Angeles office.

43.    For the purported Second Loan Agreement, when it purportedly came due for payment, September 16, 2021 (and for months thereafter), the Xhail/HYPH entities never demanded payment.  Rather, in September 2021, Renard confirmed that the purported loan did not need to be repaid.  That is because the arrangement was always that the money for the furnishings was to be repaid once the company completed the next funding round (which did not happen before Defendant was ousted).  Had Defendant known that the Xhail/HYPH entities intended to treat the Second Loan Agreement as a real loan, including without limitation enforcing the payment due date regardless of whether the company had completed the next funding round, Defendant would not have signed the document.

44.    Further, in Ireland in May of 2022, at an in-person meeting Defendant had with Alex Dessaure, a Chairman of the Board at that time, Mr. Dessaure acknowledged the real arrangement and that the characterization of the First Loan Agreement and Second Loan Agreement as true loans, as stated in this case, is a

misrepresentation.

45.     Defendant has also learned that a shareholder in the Xhail/HYPH entities (Charles Wooten) offered to pay the Xhail/HYPH entities to cover the purported loan referenced in Second Loan Agreement.  However, the Xhail/HYPH entities ignored that offer.

46.     Defendant contends that the Xhail/HYPH entities are using this case, including representing that the First Loan Agreement and Second Loan Agreement are true loans when the Xhail/HYPH entities know that not to be true, to pressure Defendant into settling issues stemming from Defendant's improper ouster (among other things).

47.     On November 19, 2021, Defendant received an email and letter from Steve Gallucci (Chief Financial Officer for the Xhail group of companies at the time) purporting to terminate Defendant's employment because Defendant's visa status did not permit Defendant to legally work or reside in the United States.  However, Defendant was legally permitted to work and reside in the United States.  Defendant believes that Renard concocted Defendant's visa status issue as a basis to terminate Defendant.  Defendant believes Renard decided to terminate Defendant because of a disagreement between Renard and Defendant the day prior and Defendant's statements of displeasure with Renard thereafter.   Defendant has personally witnessed Renard's history of terminating people who disagree with and/or challenge Renard.

48.    As far as Defendant knows and has learned through discovery in this case, the Xhail/HYPH entities never consulted legal counsel or did any real due diligence before sending the November 19, 2021 letter.  Rather, as far as Defendant knows and has learned through discovery in this case, the decision to terminate was made solely by Renard, and Renard's basis for the conclusion that Defendant's visa status did not permit Defendant to legally work or reside in the United States was Renard's personal knowledge of immigration laws.  Renard is not an attorney, let alone an immigration attorney.

49.    Further, for example, far as Defendant knows and has learned through discovery in this case, the individuals at the Xhail/HYPH entities involved with creating, editing, and approving the November 19, 2021 letter (Steve Gallucci, Max Renard, Anders Thorsell, Alexander Dessauer, and Liza Hayes) did not even know that Defendant had a written employment agreement, which, among other things, did not permit Defendant to be terminated in the manner he was.

50.    As another example, the November 19, 2021 letter purports to have given Defendant 48 hours to provide documentation that Defendant was legally permitted to work and reside in the United States, but that was a sham.  For one thing, the November 19, 2021 letter was sent to Defendant on a Friday night at 9:02 p.m., making it difficult if not impossible for Defendant to respond during the arbitrary window that transpired completely over non-business hours. Notwithstanding, Defendant's attorney did provide a response on November 21,

2021 detailing Defendant's lawful U.S. immigration status.

51.    As further evidence of the sham, the November 19, 2021 letter states that "Xhail will terminate" Defendant's employment if it does not receive requested documentation, showing Defendant was legally permitted to work and reside in the United States, the within 48 hours.  However, at 1:06 a.m. on November 20, 2021, just over four hours after the letter had been sent to Defendant purportedly giving him 48 hours, Liza Hayes (the "Chief of Staff" of Xhail) sent Defendant an email that stated, among other things, "[p]ursuant to Steve's email earlier and considering you are no longer an employee of Xhail…."

52.    On March 3, 2022, Defendant filed a complaint with the Ireland Workplace Relations Commission (since Defendant's employment contract was with the company that is now named Hyph Ireland Limited).  As part of those proceedings, it was specifically noted that "the Respondent [Hyph Ireland Limited] does not dispute that the Complainant [Kiely] was Unfairly Dismissed."  On February 21, 2024, the Workplace Relations Commission Adjudication Officer issued his Decision that granted an award in Defendant's favor in the amount of €464,000.

<u>FIRST DEFENSE</u>

(Failure to State a Claim)

53.    Defendant is informed and believes, and on that basis states and alleges, that the Complaint fails to state a claim upon which relief may be granted against

Defendant.

## SECOND DEFENSE

### (Lack of Causation)

54.     Defendant is informed and believes, and on that basis states and alleges, that there is no cause or connection between any conduct of Defendant, or on the part of any of the agents, representatives, and/or employees of Defendant, and any alleged loss or damage which Plaintiffs allege Plaintiffs have sustained. Accordingly, Plaintiffs are barred from any recovery in this action.

## THIRD DEFENSE

### (Unclean Hands)

55.     Defendant is informed and believes, and on that basis states and alleges, that Plaintiffs' claims are barred in whole or in part by the doctrine of unclean hands.

56.     As detailed above, Plaintiffs seek affirmative relief per the First Loan Agreement and Second Loan Agreement, but Plaintiffs are guilty of conduct involving fraud, deceit, unconscionability, or bad faith directly related to the agreements.   Plaintiffs knew that the First Loan Agreement was merely an accounting mechanism (of Plaintiff's own making) and that it was directly tied to Defendant's employment, i.e., Defendant's housing was part of his compensation package, and payments under the First Loan Agreement are expressly tied to deductions from Defendant's payroll.  Plaintiffs engaged in bad faith conduct by improperly terminating Defendant, which defeated the basis for the payments under

the First Loan Agreement.   Plaintiffs have acknowledged that Defendant was improperly terminated.   Also, repayment of the Second Loan Agreement was premised on the company engaging in a funding round.   However, Plaintiffs improperly terminated Defendant before that funding round closed (or even occurred), defeating the basis for the payments under the Second Loan Agreement. Further, Plaintiffs' conduct has injured Defendant and affects the balance of equities between the parties.   Plaintiffs took away Defendant's means of making money and ousted him from the company he founded.   It would be unconscionable to permit Plaintiffs to enforce the First Loan Agreement and Second Loan Agreement when it was Plaintiffs' own bad faith conduct that made it impossible for Defendant to comply with the agreements.

FOURTH DEFENSE

(In Pari Delicto)

57.   Defendant is informed and believes, and on that basis states and alleges, that Plaintiffs' claims are barred in whole or in part by the doctrine of in pari delicto because, to the extent any wrongdoing occurred, Plaintiffs participated in the alleged wrongdoing and therefore cannot recover damages for any such wrongdoing.

58.   Similar to Defendant's unclean hands defense, the pari dilecto doctrine is an affirmative defense whereby a party is barred from recovering damages if his losses are substantively caused by activities the law forbade him to engage in.   Here, Plaintiffs should be barred from recovering damages because their losses are

substantively caused by activities the law forbade Plaintiffs to engage in, namely improperly terminating Defendant (as acknowledged by Plaintiffs). Plaintiffs' own unlawful conduct directly led to making it impossible for Defendant to comply with the agreements.

FIFTH DEFENSE

(Estoppel)

59.     Defendant is informed and believes, and on that basis states and alleges, that Plaintiffs, by reason of its independent actions or omissions to act, is estopped from seeking and obtaining recovery of damages from Defendant on each and every claim in the Complaint.

60.     As detailed above, Plaintiffs made misrepresentations that Defendant reasonably relied upon to his detriment. For the purported First Loan Agreement, again, Plaintiffs represented that the purported "loan" was actually an accounting mechanism for the company to pay for Defendant's housing in Los Angeles while he worked at the Los Angeles office. For the purported Second Loan Agreement, Plaintiffs represented that the Second Loan Agreement did not have to be repaid until the company engaged in a funding round so that Defendant could get the money to repay the Second Loan Agreement. Now, Plaintiffs' attempt to enforce the agreements shows that Plaintiffs' representations were not true. Defendant reasonably relied on Plaintiffs' misrepresentations to his detriment. Had Defendant known that Plaintiffs intended to oust Defendant from the company, Defendant

would not have signed agreements. Again, it would have made no sense for Defendant to commit to a 12-month lease in Los Angeles and purchase new furniture for new housing unless Defendant was working for the company in the Los Angeles office.

## SIXTH DEFENSE

### (Waiver/Release)

61.    Defendant is informed and believes, and on that basis states and alleges, that Plaintiffs, by reason of Plaintiffs' independent actions or omissions to act, have waived and/or released Plaintiffs' right, if any, to pursue the claims alleged against Defendant in the Complaint.

62.    As detailed above, Plaintiffs knew of their existing rights under the Second Loan Agreement but actually intended to relinquish the rights. Again, when the Second Loan Agreement purportedly came due for payment, September 16, 2021 (and for months thereafter), the Plaintiffs never demanded payment. Rather, in September 2021, Renard confirmed that the purported loan did not need to be repaid. That is because the arrangement was always that the money for the furnishings was to be repaid once the company completed the next funding round (which did not happen before Defendant was ousted).

## SEVENTH DEFENSE

### (Consent)

63.    Defendant is informed and believes, and on that basis states and alleges,

that Plaintiffs' claims are barred in whole or in part because it consented to the conduct.

64.     As detailed above, Plaintiffs consented to the structure of the First Loan Agreement and the Second Loan Agreement.  For the First Loan Agreement, Plaintiffs consented that payments would only be made through Defendant's payroll. In fact, Plaintiffs set up the system whereby payments were made through Defendant's payroll.  Again, Plaintiffs consented to the arrangement that the Second Loan Agreement would be repaid once the company completed the next funding round (which did not happen before Defendant was ousted).

EIGHTH DEFENSE

(Ratification)

65.     Defendant is informed and believes, and on that basis states and alleges, that Plaintiffs' claims are barred in whole or in part by the doctrine of ratification.

66.     As detailed above, Plaintiffs engaged in voluntary and positive acts, or deliberate inaction, ratifying the structure of the First Loan Agreement and the Second Loan Agreement.  For the First Loan Agreement, Plaintiffs ratified that payments would only be made through Defendant's payroll by setting up the system whereby payments were made through Defendant's payroll.  Plaintiffs ratified the arrangement that the Second Loan Agreement would be repaid once the company completed the next funding round (which did not happen before Defendant was ousted) by failing to demand payment when the Second Loan Agreement came due

by its terms and by expressly confirming the arrangement.

## NINTH DEFENSE

### (Excuse)

67.    Defendant is informed and believes, and on that basis states and alleges, any duty of performance by Defendant in connection with the claims is excused by reason of a failure of consideration, prior breach, breach of condition precedent, prevention by Plaintiffs, frustration of purpose, waiver by Plaintiffs, and/or acceptance by Plaintiff.

68.    As detailed above, Defendant should be excused from any duty of performance because Plaintiffs' unlawful termination of Defendant frustrated the entire purpose of the First Loan Agreement and the Second Loan Agreement.  The premise of the agreements was that Defendant would be working for the company in Los Angeles.  Again, it would have made no sense for Defendant to commit to a 12-month lease in Los Angeles and purchase new furniture for new housing unless Defendant was working for the company in the Los Angeles office.

## TENTH DEFENSE

### (Rescission Based on Fraudulent Inducement)

69.    Defendant is informed and believes, and on that basis states and alleges, that Plaintiffs' claims are barred in whole or in part because the alleged contracts Plaintiffs have put at issue were induced by Plaintiffs' fraud.

70.    As detailed above, Plaintiffs made misrepresentations that Defendant

reasonably relied upon to his detriment.  For the purported First Loan Agreement, again, Plaintiffs represented that the purported "loan" was actually an accounting mechanism for the company to pay for Defendant's housing in Los Angeles while he worked at the Los Angeles office.  For the purported Second Loan Agreement, Plaintiffs represented that the Second Loan Agreement did not have to be repaid until the company engaged in a funding round so that Defendant could get the money to repay the Second Loan Agreement.  Now, Plaintiffs' attempt to enforce the agreements shows that Plaintiffs' representations were not true.  Defendant reasonably relied on Plaintiffs' misrepresentations to his detriment.  Had Defendant known that Plaintiffs intended to oust Defendant from the company, Defendant would not have signed agreements.  Again, it would have made no sense for Defendant to commit to a 12-month lease in Los Angeles and purchase new furniture for new housing unless Defendant was working for the company in the Los Angeles office.

<u>ELEVENTH DEFENSE</u>

(Coercion/Duress)

71.    Defendant is informed and believes, and on that basis states and alleges, that Plaintiffs' claims are barred in whole or in part because the alleged contracts Plaintiffs have put at issue were induced by Plaintiffs' coercion and under duress.

72.    Plaintiffs used their superior position as Defendant's employer and sole source of income to get Defendant to sign the purported loan agreements.  As

detailed above, housing reimbursement was already part of Defendant's compensation, and it was Max Renard who proposed that Defendant move into new housing when Defendant agreed to a pay increase and official position of CEO for Renard.  It was then Renard who negotiated the lease for Defendant and came up with the mechanism to have Defendant pay for the lease and have payments come out of Defendant's payroll.  Renard then led the unlawful termination of Defendant, which made it impossible for Defendant to comply with the agreements and left Defendant with no legal remedy to protect himself against enforcement of the agreements.

<u>TWELFTH DEFENSE</u>

(Unconscionability)

73.     Defendant is informed and believes, and on that basis states and alleges, that Plaintiffs' claims are barred in whole or in part because the alleged contracts Plaintiffs have put at issue are unconscionable.

74.     As detailed above, enforcement of the First Loan Agreement and Second Loan Agreement as written would be unconscionable, especially considering Plaintiffs' bad faith directly related to the agreements.  Plaintiffs knew that the First Loan Agreement was merely an accounting mechanism (of Plaintiff's own making) and that it was directly tied to Defendant's employment, i.e., Defendant's housing was part of his compensation package, and payments under the First Loan Agreement are expressly tied to deductions from Defendant's payroll.  Plaintiffs

were then the ones that orchestrated the arrangement where payments under the First Loan Agreement were made as deductions from Defendant's payroll. Defendant had no meaning choice in that arrangement. Plaintiffs then engaged in bad faith conduct by improperly terminating Defendant, which defeated the basis for the payments under the First Loan Agreement. Plaintiffs have acknowledged that Defendant was improperly terminated. Also, repayment of the Second Loan Agreement was premised on the company engaging in a funding round. However, Plaintiffs improperly terminated Defendant before that funding round closed (or even occurred), defeating the basis for the payments under the Second Loan Agreement. Further, Plaintiffs' conduct has injured Defendant and affects the balance of equities between the parties. Plaintiffs took away Defendant's means of making money and ousted him from the company he founded. It would be unconscionable to permit Plaintiffs to enforce the First Loan Agreement and Second Loan Agreement when it was Plaintiffs' own bad faith conduct that made it impossible for Defendant to comply with the agreements.

<u>THIRTEENTH DEFENSE</u>

(Reformation)

75.    Defendant is informed and believes, and on that basis states and alleges, that Plaintiffs' claims are barred in whole or in part because the alleged contracts Plaintiffs have put at issue require reformation to express the real agreement of the parties.

76.     As detailed above, the First Loan Agreement and Second Loan Agreement do not accurately reflect the agreement of the parties.  Plaintiffs know that the First Loan Agreement was merely an accounting mechanism (of Plaintiff's own making) and that it was directly tied to Defendant's employment, i.e., Defendant's housing was part of his compensation package, and payments under the First Loan Agreement are expressly tied to deductions from Defendant's payroll. Plaintiffs also know that repayment of the Second Loan Agreement was premised on the company engaging in a funding round.  However, Plaintiffs improperly terminated Defendant before that funding round closed (or even occurred), defeating the basis for the payments under the Second Loan Agreement.  The First Loan Agreement and Second Loan Agreement must be reformed to reflect the true agreements of the parties.

<u>FOURTEENTH DEFENSE</u>

(Impracticability)

77.     Defendant is informed and believes, and on that basis states and alleges, that Plaintiffs' claims are barred in whole or in part by the doctrine of impracticability.

78.     As detailed above, the basic assumption of the First Loan Agreement was that it was directly tied to Defendant's employment, i.e., Defendant's housing was part of his compensation package, and payments under the First Loan Agreement are expressly tied to deductions from Defendant's payroll.  The basic

assumption of the Second Loan Agreement was that repayment was premised on the company engaging in a funding round. Plaintiffs' improper termination of Defendant has made it commercially impractical to continue with the agreement. Similarly, Plaintiffs' improper termination of Defendant before that funding round closed (or even occurred) made it commercially impractical to continue with the Second Loan Agreement. Defendant never expressly or impliedly agreed to performance in spite of the impracticability.

## FIFTEENTH DEFENSE

(Lack of Consideration)

79.   Defendant is informed and believes, and on that basis states and alleges, that Plaintiffs' claims are barred in whole or in part because the alleged contracts Plaintiffs have put at issue lacked adequate consideration and/or constituted illusory promises.

80.   As detailed above, the First Loan Agreement lacks consideration because it relates to a situation in which the parties were already bound – Defendant's pre-existing employment and compensation. Again, housing reimbursement was already part of Defendant's compensation, and the First Loan Agreement only came into existence because Plaintiffs wanted to change the mechanism by which Defendant's housing was already paid for. That only benefited the company. That change in mechanism did not result in any new benefit to Defendant for signing the purported loan agreements.

## SIXTEENTH DEFENSE

### (Lack of Damages)

81.     Defendant is informed and believes, and on that basis states and alleges, that Plaintiff has not incurred any compensatory, general, or special damages as a result of the allegations in the Complaint, and, to the extent any exist, said damages were not the result of or caused by any wrongful acts, omissions, or conduct of Defendant. Plaintiffs, therefore, are barred from recovering any compensatory, general, consequential, or special damages from Defendant.

## SEVENTEENTH DEFENSE

### (Failure to Mitigate Damages)

82.     Defendant is informed and believes, and on that basis states and alleges, that should any loss, damage, or detriment have occurred as alleged in the Complaint, Plaintiffs' damages should be reduced, in whole or in part, as a result of Plaintiffs' failure to mitigate damages.

83.     Plaintiffs took no reasonable steps to mitigate their alleged damages. Plaintiffs could have obviously refrained from unlawfully terminating Defendant or reinstated Defendant's employment, which would have mitigated Plaintiffs' damages on the First Loan Agreement because payments would have been made through Defendant's payroll.  Further, as noted above, Defendant has also learned that a shareholder in the Xhail/HYPH entities (Charles Wooten) offered to pay the Xhail/HYPH entities to cover the purported loan referenced in Second Loan

Agreement.  However, the Xhail/HYPH entities ignored that offer.

## EIGHTEENTH DEFENSE

### (Setoff and Recoupment)

84.     Defendant is informed and believes, and on that basis states and alleges, that Plaintiffs' claims are barred in whole or in part by the equitable doctrine of setoff and recoupment to offset all payments made to Plaintiffs, all other payments or benefits provided to Plaintiffs by Defendant to which Plaintiffs were not entitled, and all obligations owed to Defendant by against any judgment that may be entered against Defendant.

85.     Defendant is entitled to recoupment in the form of a deduction from the amount of any damages awarded to Plaintiffs because Plaintiffs have not complied with their obligations or covenants arising under the First Loan Agreement and/or the Second Loan Agreement.  As detailed above, Plaintiffs failed to comply with the true nature of the agreement for the First Loan Agreement, wherein the First Loan Agreement was merely an accounting mechanism (of Plaintiff's own making) and was directly tied to Defendant's employment, i.e., Defendant's housing was part of his compensation package, and payments under the First Loan Agreement are expressly tied to deductions from Defendant's payroll.  As detailed above, Plaintiffs failed to comply with the true nature of the agreement for the Second Loan Agreement, wherein the Second Loan Agreement would be repaid in one lump sum once Defendant had sold certain shares after the company's next funding round that

was to close in the summer of 2021.  However, that round ran late and did not close until after Defendant was ousted.

86.    Defendant is entitled to a setoff of any damages awarded to Plaintiffs based on the award in Defendant's favor for Defendant's unlawful termination.  On March 3, 2022, Defendant filed a complaint with the Ireland Workplace Relations Commission (since Defendant's employment contract was with the company that is now named Hyph Ireland Limited).  As part of those proceedings, it was specifically noted that "the Respondent [Hyph Ireland Limited] does not dispute that the Complainant [Kiely] was Unfairly Dismissed."   On February 21, 2024, the Workplace Relations Commission Adjudication Officer issued his Decision that granted an award in Defendant's favor in the amount of €464,000.

## NINETEENTH DEFENSE

### (No Attorney's Fees)

87.    Defendant is informed and believes, and on that basis states and alleges, that any conduct alleged by Plaintiffs does not justify the recovery of any attorneys' fees from Defendant.

Defendant reserves the right to assert additional defenses if discovery or Defendant's investigation reveals grounds for the assertion of the additional defenses, including without limitation defenses that are referenced in Rule 8(c) of the Federal Rules of Civil Procedure or are otherwise available under applicable law.

## <u>DEFENDANT'S PRAYER FOR RELIEF</u>

Wherefore, Defendant prays for judgment against Plaintiffs as follows:

1.   That Plaintiffs take nothing by way of the Complaint and that Plaintiffs'

Complaint be dismissed; and

2.   For such other and further relief as the Court deems just and proper.


OF COUNSEL:

Nicholas A. Kurtz
(Admitted *pro hac vice*)
ANNIGIAN RYAN LLP
333 N. Indian Hill Boulevard
Claremont, California 91711
Tel:   (909) 981-0475
Fax:   (909) 981-0113
Email: nk@arllp.com


May 24, 2024

**PINCKNEY, WEIDINGER,
URBAN & JOYCE LLC**

/s/ *Helena C. Rychlicki*
Helena C. Rychlicki ( DE No. 3996)
2 Mill Road, Suite 204
Wilmington, Delaware 19806
Main: (302) 504-1497
Fax: (302) 442-7046
hrychlicki@pwujlaw.com

*Attorneys for Defendant Michael J. Kiely*